## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**SAMANTHA ANN MCGEE**                    **CASE NO.  6:19-CV-01662**

**VERSUS**                                **JUDGE JUNEAU**

**U S COMMISSIONER SOCIAL**               **MAGISTRATE JUDGE**
**SECURITY ADMINISTRATION**               **WHITEHURST**


## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

## Administrative Proceedings

Claimant, Samantha McGee, fully exhausted her administrative remedies

before filing this action in federal court. She filed an application for supplemental

security income (SSI) benefits on October 31, 2016, and a second application for

SSI benefits on May 10, 2017, alleging disability beginning on September 26, 2016.

(Rec. Doc. 7-1, p. 111-21). Her application was denied. (Rec. Doc. 7-1, p. 62-66).

She then requested a hearing, which was held on June 21, 2018 before

Administrative Law Judge Carol Latham. (Rec. Doc. 7-1, p. 29-49). The ALJ issued

a decision on December 20, 2018, concluding that Claimant was not disabled within

the meaning of the Social Security Act from the claimed disability onset date through

the date of the decision. Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 7-1, p. 4). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on September 5, 1970. She was 46 years old on the alleged disability onset date and 48 years old at the time of the ALJ's decision. Claimant has a seventh grade education and last held a job as a cashier several years ago, but she was fired because she could not count change. (Rec. Doc. 7-1, p. 35-36). She alleged that she has been disabled since September 26, 2016 due to mental deficiencies, including anxiety and depression. She also alleged at the hearing that she cannot work due to pain in her left side. The medical records in the record reveal the following pertinent history:

- September 25, 2015 – Claimant was seen at Lafayette General Emergency Room complaining of left upper abdominal pain for more than three years. (Rec. Doc. 7-1, p. 209-15). She was diagnosed with kidney stones and GERD. Her abdominal ultrasound was normal.

2

- November 22, 2016 – Records, though of poor quality and difficult for the Court to discern, indicate Claimant reported anxiety which comes and goes, without suicidal thoughts, and limited insomnia. Claimant also noted ongoing stressors and chronic abdominal pain. It appears from these records that her mood improved with medication. (Rec. Doc. 7-1, p. 221-25).

- January 6, 2017 – Claimant underwent examination by Dr. Ira Markowitz on behalf of SSA for allegations of "left side hurts," depression, and possible bipolar. The physical exam showed that she could get up from the chair without difficulty, but she had trouble getting on and off the exam table. Her gait was abnormal and markedly myopathic. Dr. Markowitz assessed limitations for walking, standing, bending/stopping, reaching, handling, grasping, lifting, and carrying. (Rec. Doc. 7-1, p. 228-32). See also February 14, 2017 report of Dr. Matheen Khan, the state agency consultative examiner, who found that, based on the consultative exam, Claimant did not have a medically determinable impairment and that the physical evidence did not support more than minimal limitations in physical functions of work. (Rec. Doc. 7-1, p. 53-54).

- January 9, 2017 Consultative Examination Report by Dr. Alfred Buxton, Ph.D. on behalf of SSA. Dr. Buxton diagnosed dysthymic disorder and borderline intellectual functioning. He assessed her Global Assessment of

Functional Scale score at 55-60. She was noted to be on several psychoactive medicines at that time. She had self-reported herself as marginally literate. Her intellect was judged to be about borderline with commensurate adaptive daily living skill development, though she reported some compromise adaptively secondary to some chronic pain issues. Dr. Buxton opined that continued outpatient mental health intervention to with deal with dysthymia and pain complaints would be appropriate. He found she was bright enough to understand simple instruction and command but would likely be overwhelmed by more complex instruction and command. With adequate intrinsic motivation and an emphasis on performing simple unskilled tasks that would not aggravate her pain complaints, he opined that at a minimally adequate level she would be able to respond in a reliable manner as an employee, and could likewise be able to tolerate the frustration and stress she would encounter in a job setting. With adequate intrinsic motivation and a provision that she would not have to interact with too many co-workers or supervisors, then perhaps at a minimally adequate level she would be able to establish and maintain mutually rewarding relationships with co-workers and supervisors. With continued mental health intervention services, Dr. Buxton opined that perhaps over time her overall functional capabilities as an employee would gradually improve. (Rec. Doc. 7-1, p. 236-42).

- January 27, 2017 – Dr. Bruce Lochner, state agency psychological examiner, opined that Claimant is able to understand and remember simple instructions but would likely be overwhelmed by more complex instructions. Dr. Lochner opined that she would be able to perform simple unskilled tasks and basic work requirements related to social interaction and adaptation. He concluded that, based on her examination revealing intact basic cognitive functions, observation, and her medical history, she functioned at the borderline intellectual level and suffered from dysthymic disorder, but that she should have no more than moderate impairment in global functioning and would be capable of basic work functions for unskilled work. (Rec. Doc. 7-1, p. 54-56).

- April/May 2017 – Claimant was hospitalized and followed up for acute renal failure at Abbeville General. Upon her discharge on May 1, 2017, her acute renal failure syndrome was noted as resolved and she was to remain well hydrated. She was also diagnosed with asymptomatic hypokalemia, for which she declined medication, chronic kidney disease stage 3, with stable renal function noted, and hypertensive disorder noted as stable. She was to remain well hydrated, refrain from NSAIDS, and follow a protein renal diet. (Rec. Doc. 7-1, p. 256-58).

- May 2017 through May 2018 – Claimant underwent treatment and ultimately a hysterectomy with bilateral salpingo-oophorectomy due to a large right

5

ovarian cyst which had been causing lower abdominal pain and pelvic pain. (Rec. Doc. 7-1, p. 267-312).

- An April 24, 2018 encounter at Abbeville Community Health shows Claimant presented with severe panic attack and increased anxiety after her mother died in October 2017 and her fiancé died in December 2017. In each prior visit, dating back to December 2016, she was noted as having anxiety which comes and goes unrelated to exertion or dangerous situation and initial or limited insomnia at times. She had no suicidal or homicidal thoughts. Her appearance, clothing, and grooming were noted as normal at each visit. These records indicate that Claimant experienced several stressful situations, such as illness and death of loved ones, but that medications helped her mood and anxiety. (Rec. Doc. 7-1, p. 329-55). See also Rec. Doc. 7-1, p. 368, wherein Claimant reported that medicine and therapy helped her mood and sleep.

- May 13, 2018 – Claimant was admitted at Abbeville General due to acute chest pain and supraventricular tachycardia, and elevated troponin. She was treated and released the next day. (Rec. Doc. 7-1, p. 400-14).

- A June 1, 2018 encounter note at Abbeville Community Clinic with Robin Mouton, LCSW, noted one psychiatric hospital admit when she was 28 years old after an argument with her fiancé, and she thereafter underwent outpatient counseling for three months with medication management. She had been

referred in 2016 for psychotherapy services with a diagnosis of major depression and dysthymia. Her depression had been exacerbated by several recent deaths of loved ones. Claimant treated for her depression with further counseling (Rec. Doc. 7-1, p. 369-71). Throughout, she maintained prescriptions for citalopram, Klonopin, Zyprexa, prazosin, and enalapril-hydrochlorothiazide.

Claimant testified at the June 21, 2018 hearing that she receives mental health counseling at Abbeville Community Service once per month, though at the time of the hearing she had only been once. (Rec. Doc. 7-1, p. 34; 39). She testified that she can write simple words, but she cannot read well. (Rec. Doc. 7-1, p. 36). She also attributes her disability to undiagnosed pain in her left side. She testified that her left side swells "very often," that she is unable to sit or stand too long because of the pain, and she cannot lift or carry anything over five pounds because of the pain in her left side. (Rec. Doc. 7-1, p. 36; 39-41). Her sister often must tell her to do household chores, brush her hair, and change her clothes, because she claimed to not know how to match her clothes. (Rec. Doc. 7-1, p. 40-42). She testified that all she does daily is sit and watch TV, and that her sister handles the household responsibilities, such as paying bills and grocery shopping. (Rec. Doc. 7-1, p. 42-43). She testified that she was able to obtain a driver's license after the test was read

7

to her, and that she has memory problems. Others often make fun of her. (Rec. Doc. 7-1, p. 43-45).

A Function Report completed by Claimant's in-law, Betty DeCoux, on December 7, 2016 indicates that Claimant has to be told what to do to help around the house. According to Ms. DeCoux, Claimant would watch TV all day long if she could, and she had no education, except that she can read sometimes. She tries hard to learn things, but she cannot. At times she wets herself and has to be told to change. She is able to prepare her own meals and do some shopping, but she does not understand money. She watches TV and plays cards well. (Rec. Doc. 7-1, p. 145-53).

Claimant's sister, Amanda Melancon, sent written correspondence to the ALJ on June 27, 2018 advising of an event in which Claimant's friends had convinced her to take crystal meth so she could feel happy after losing her mother and boyfriend. Ms. Melancon described Claimant as simple-minded and in need of help. (Rec. Doc. 7-1, p. 198-202).

The ALJ ultimately determined that Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren*

*v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

### B.    <u>Entitlement to Benefits</u>

Supplemental Security Income SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).  See also *Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives,

whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This

11

burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

### D.   **The ALJ's Findings and Conclusions**

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since October 3, 2016. (Rec. Doc. 7-1, p. 16). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: borderline intellectual functioning (BIF), generalized anxiety disorder (GAD), depressive disorder, and dysthymic disorder. (Rec. Doc. 7-1, p. 16). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 7-1, p. 17). Claimant does not challenge this finding.

The ALJ next found that Claimant has the residual functional capacity (RFC) to perform a full range of work with certain non-exertional limitations relative to complexity of task and social interactions. (Rec. Doc. 7-1, p. 18-22). Claimant challenges this finding.

At step four, the ALJ found that Claimant has no past relevant work. (Rec. Doc. 7-1, p. 22). Claimant does not challenge this finding.

At step five, the ALJ found that, based on Claimant's age, education, work experience, and RFC, Claimant is able to perform a significant number of jobs in the national economy. (Rec. Doc. 7-1, p. 22-23). Claimant challenges this finding insofar as she challenges the ALJ's RFC finding.

### E.    The Allegations of Error

Claimant alleges the ALJ erred as follows:

1) By failing to develop the facts fully and fairly regarding the unrepresented Claimant.

2) By failing to address in the RFC analysis whether Claimant can perform the demands of work on a regular and continuing basis.

### F.    Whether the ALJ fully and fairly developed the facts regarding the unrepresented Claimant.

When the claimant is not represented by counsel, the ALJ is "under a heightened duty to scrupulously and conscientiously explore all relevant facts." *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003). The ALJ satisfies this

duty by questioning the claimant in depth regarding the pertinent issues and allowing the claimant an opportunity to speak at the hearing. See *id*.

Claimant contends that the ALJ failed to fully develop the facts with the unrepresented Claimant, because the ALJ failed to hear testimony from her sister and failed to obtain IQ testing. The Court disagrees. As the hearing transcript reflects, the ALJ questioned Claimant at length about her education, background, daily activities, alleged disability, and medical treatment. (Rec. Doc. 7-1, p. 31-45). The ALJ also gave Claimant the opportunity to state anything she wanted to be known on the record. (Rec. Doc. 7-1, p. 48). The ALJ also considered a letter from Claimant's sister describing her as "weak minded" and reporting that she was easily influenced by others and had difficulty reading. (Rec. Doc. 7-1, p. 19, referencing statement at p. 198-202). The Court finds that the ALJ adequately developed the record in this regard.

The Court likewise disagrees that the ALJ should have obtained an IQ test. The ALJ's duty to undertake a full inquiry "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Turner v. Califano,* 563 F.2d 669, 671 (5th Cir.1977) (emphasis in original). "The decision to require such an examination is within the discretion of

14

the ALJ." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) In *Pierre v. Sullivan*, the Fifth Circuit instructed as follows:

> The isolated comments about the limits of Pierre's intellectual functioning, when viewed within the record as a whole, were not sufficient to raise a suspicion that Pierre was mentally retarded. This is not a case in which the ALJ failed to act upon a claimant's request for a consultative examination, *see, e.g., McGee v. Weinberger,* 518 F.2d 330, 332 (5th Cir.1975), or upon the Secretary's own consulting physician's recommendation that the claimant undergo further testing, *see, e.g., Fraction v. Bowen,* 787 F.2d 451, 454 (8th Cir.1986). When there is no contention that a claimant is mentally retarded, a few instances in the record noting diminished intelligence do not require that the ALJ order an I.Q. test in order to discharge his duty to fully and fairly develop the record. *Cf. Jones v. Bowen,* 829 F.2d 524, 526 (5th Cir.1986) (isolated comments by claimant insufficient to raise suspicion of mental impairment necessary to require ALJ to order consultative examination); *Kimbrough v. Secretary,* 801 F.2d 794, 797 (6th Cir.1986) (when claimant had never asserted a mental impairment, no affirmative duty upon ALJ to conduct psychological examinations on all for whom source of pain is not objectively proven to be organic).

*Pierre*, 884 F.2d at 803.

As in *Pierre*, there is no medical evidence in the record suggesting that Claimant is mentally retarded. Dr. Alfred Buxton, Ph.D. determined her intellect to be about borderline. (Rec. Doc. 7-1, p. 242). Moreover, Claimant appears to have completed all the necessary documentation for pursing this claim, including completion of the Work Background Form (Rec. Doc. 7-1, p. 190-91) and submission of a handwritten letter regarding additional medical information. The letter does not evidence any issues with writing or comprehension. (Rec. Doc. 7-1, p. 203). She likewise spoke clearly and effectively at the hearing and was able to

obtain a driver's license. (Rec. Doc. 7-1, p. 44-45). Thus, the Court finds that the ALJ was not obligated to order an IQ test. Claimant's first allegation of error lacks merit.

**G.     Whether the ALJ considered whether Claimant can perform the demands of work on a regular and continuing basis in determining her RFC.**

Claimant next contends the ALJ failed to consider whether she can perform the demands of work on a regular and continuing basis in determining Claimant's RFC. The Fifth Circuit summarized the applicable law as follows:

> First, SSR 96–8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." 1996 WL 374184, *1 (S.S.A.1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* at *2. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work...." *Id.* RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* at *5. "Each function must be considered separately." *Id.* "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis...." *Id.* at *7. The RFC assessment must include a resolution of any inconsistencies in the evidence. *Id.*

> Second, SSR 96–9p also provides:

> [i]nitially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to

perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

1996 WL 374185, *2 (S.S.A.1996). SSR 96–9p also defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.[2] *Id.* at *5.

*Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).

The Court finds that substantial evidence supports the ALJ's RFC finding. The ALJ considered the medical records outlined above which show that Claimant does suffer from anxiety, depression, and dysthymic syndrome; however, the records show that these conditions are controlled with medication. (See e.g. Rec. Doc. 7-1, p.221-25; 329-55; 368). None of Claimant's treating physicians suggested that her mental impairments would limit her ability to work, and she has not been hospitalized for mental health issues or received mental health treatment other than medication and counseling, which, according to the records, appear to improve her symptoms.

Upon the SSA's referral for psychological report, Dr. Buxton opined that Claimant would be appropriately treated with continued outpatient mental health intervention to deal with her dysthymia. He found that with adequate intrinsic

17

motivation and an emphasis on performing simple unskilled tasks that would not aggravate her pain complaints, she could be a reliable employee. With adequate intrinsic motivation and a provision that she would not have to interact with too many co-workers or supervisors, then she could perhaps establish and maintain mutually rewarding relationships with co-workers and supervisors. Dr. Buxton concluded that with continued mental health intervention services, her overall functional capabilities as an employee could gradually improve. (Rec. Doc. 7-1, p. 236-42). The ALJ gave some weight to Dr. Buxton's report, finding it inherently inconsistent. The ALJ likewise gave some weight to Claimant's GAF score ranging from 50-60.[1]

The ALJ gave great weight to Dr. Lochner, the state agency psychological consultant, who opined that Claimant is able to understand and remember simple

---

[1]     The Global Assessment of Functioning ("GAF") scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") at 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a person's emotional status. A GAF score in the range of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF score in the range of 41 to 50 indicates serious symptoms such as suicidal ideation or any serious impairment in social, occupational, or school functioning. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013). Although still used by many mental health professionals, GAF scores are not determinative of a claimant's ability to work. *Fuller v. Astrue*, No. 4:09-CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex Oct. 13, 2010), adopted in 766 F.Supp. 2d 1149, 2011 WL 94549 (N.D. Tex. Jan. 11, 2011); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb. 13, 2012).

instructions but would likely be overwhelmed by more complex instructions. Dr. Lochner opined that she would be able to perform simple unskilled tasks and basic work requirements related to social interaction and adaptation. He concluded that, based on her examination revealing intact basic cognitive functions, observation, and her medical history, she functioned at the borderline intellectual level and suffered from dysthymic disorder, but that she should have no more than moderate impairment in global functioning and would be capable of basic work functions for unskilled work. (Rec. Doc. 7-1, p. 54-56).

The record further supports that Claimant is capable of some level of work, despite her mental impairments, in that she was able to obtain her driver's license (Rec. Doc. 7-1, p. 45), she is capable of following simple instructions (Rec. Doc. 7-1, p. 31-45; 190-92; 197; 203 evidencing her ability to speak and write coherently and effectively), and she is capable of some social interaction (Rec. Doc. 7-1, p. 198, referencing Claimant's friends; and Rec. Doc. 7-1, p. 369-70 noting that she was married for eight years, has children and grandchildren, and was engaged prior to her fiancé's death in 2017).

With regard to Claimant's physical complaints of left sided pain, none of the medical records support that Claimant is physically incapable of work at some level. Although she complained of almost constant swelling in her left side (Rec. Doc. 7-1, p. 39-40), none of the medical records note as much. Further, while her history

includes illnesses that would cause left side pain, the records show that these issues were resolved after treatment. See e.g. Rec. Doc. 7-1, p. 209-15 regarding treatment for kidney stones and GERD in 2015; Rec. Doc. 7-1, p. 256-58 regarding hospitalization for acute renal failure which resolved upon discharge; and Rec. Doc. 7-1, p. 267-312 regarding treatment for ovarian cyst. Otherwise, the records do not support Claimant's complaints of debilitating left sided pain. None of Claimant's treating physicians indicated that she was incapable of working due to physical impairments. Dr. Matheen Khan, the state agency consultative examiner to whom the ALJ attributed great weight, found that Claimant did not have a medically determinable impairment and that the physical evidence did not support more than minimal limitations in physical functions of work. (Rec. Doc. 7-1, p. 53-54).

The ALJ ultimately concluded that Claimant's mental impairments limit her to unskilled work which demands no more than simple, short instructions and work-related decisions with few workplace changes. She cannot perform work which requires her to read instructions, write reports, or perform math calculations. Her depression and anxiety limit her to no more than occasional social interactions with co-workers and the public. The Court agrees that the record supports this RFC finding. Thus, Claimant's second allegation of error is meritless.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be AFFIRMED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

Signed in Lafayette, Louisiana, this 25th day of January, 2021.

_____

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

_____

[2]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).